# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                        Case No. 06-CR-41

KEVIN TAYLOR,

        Defendant.

## RECOMMENDATION RE: DEFENDANT'S MOTIONS TO SUPPRESS

## I. PROCEDURAL BACKGROUND

On February 28, 2006, a grand jury sitting in the Eastern District of Wisconsin returned an eighteen count indictment against multiple defendants, including defendant Kevin Taylor ("Taylor"). Count One charges Taylor with, beginning sometime in 2001 and continuing through February 16, 2006, knowingly and intentionally conspiring to distribute controlled substances, to wit, cocaine, "crack cocaine," and marijuana, in violation of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. Counts Three, Four, and Nine charge Taylor with possession of a controlled substance with intent to distribute the same, on September 22, 2005, September 27, 2005, and February 16, 2006, respectively, in violation of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and Title 18 U.S.C. § 2. Count Five charges Taylor with knowingly possessing a firearm in furtherance of the drug trafficking crimes charged in Count One and Four of the indictment, in violation of Title 18 U.S.C. § 924(c)(1). Count Six charges Taylor with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), the possession of such firearm having allegedly occurred on or

about September 27, 2005. Count Ten charges Taylor with knowingly possessing a firearm in furtherance of the drug trafficking crimes charged in Count One and Nine of the indictment, in violation of Title 18 U.S.C. § 924(c)(1). Count Eleven charges Taylor with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), the possession of such firearm having allegedly occurred on or about February 16, 2006. Count Eighteen charges Taylor with knowingly and intentionally using a communication facility, namely a telephone, in facilitating the commission of Count One of the indictment, in violation of Title 21 U.S.C. § 843(b) and Title 18 U.S.C. § 2. Taylor has entered a plea of not guilty to all counts.

In accordance with the pretrial briefing schedule issued in this matter, on June 6, 2006, Taylor filed two motions to suppress physical evidence. In his first motion, Taylor moves the court to suppress "all items seized from 3118 N. 21st Street, Milwaukee, Wisconsin by Milwaukee Police Department officers on February 16, 2006." (Def's Mot., dkt. #64, at 1.) In his second motion, Taylor moves the court to suppress "all items seized from 2024 East Nash Street, Milwaukee, Wisconsin by Milwaukee Police Department officers on September 27, 2005. (Def.'s Mot., dkt. #65, at 1.) Because the issues raised by the defendant seemed to involve factual disputes, on June 21, 2006, an evidentiary hearing was conducted with respect to the defendant's motions to suppress. Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, the defendant's motions to suppress are now fully briefed and are ready for resolution. For the reasons which follow, it will be recommended that the defendant's first motion to suppress be denied and the defendant's second motion to suppress be granted.

2

## II. FACTUAL BACKGROUND

Four witnesses testified at the evidentiary hearing: City of Milwaukee Police Department Detective Mark Wagner, Gecoila O'Kelley, City of Milwaukee Police Officer Mitchell Ward , and FBI Special Agent Border Crow.  The following is a brief summary of the testimony offered at the evidentiary hearing conducted by the court on June 21, 2006.

### A.  Detective Mark Wagner

Mark Wagner ("Wagner") testified that he is a detective with the City of Milwaukee Police Department and has been a law enforcement officer for approximately twelve years (Tr. at 7.) Wagner has been a detective for approximately four and a half years.  On February 16, 2006, Wagner was assigned to help the Milwaukee High Density Drug Trafficking Area Task Force ("HIDTA") with their investigation of Kevin Taylor.  At that time, there was a federal warrant issued for Taylor's arrest.  Specifically, Wagner's assignment that morning was to help two of the HIDTA officers conduct a knock-and-talk investigation at one residence and then help with whatever they needed throughout the day.  (Tr. at 9.)  At the first residence, the officers obtained the individual's consent to search the residence for Taylor.  The officers, however, did not locate Taylor at that residence.

Wagner and the other officers then proceeded to 3118 N. 21st Street to see if Taylor was at that residence.  (Tr. at 10.)  Accompanying Wagner to 3118 N. 21st Street was Officer David Lopez ("Lopez"), Lieutenant Raymond Gibbs ("Gibbs"), and another uniformed officer.  When the four officers arrived at 3118 N. 21st St., Wagner and Gibbs went up to the residence and knocked on the front door.  Lopez and the other uniformed police officer went to the rear of the residence.  Wagner was dressed in plain clothes and had a police jacket on that said Milwaukee Police Department. After Wagner and Gibbs knocked on the front door, approximately a minute passed and a woman's

3

voice asked who it was. (Tr. at 12.) The officers responded that it was the Milwaukee Police Department. The woman, who was later identified as Gecoila O'Kelley ("O'Kelley"), then asked what the officers wanted, and the officers responded that they needed to talk to her. O'Kelley then asked the officers to "hold on," and approximately two minutes later O'Kelley opened the door. (Tr. at 12.) When O'Kelley opened the door, Wagner identified himself as Detective Wagner with the Milwaukee Police Department and asked her if he could come in and speak to her. O'Kelley then allowed Wagner and Gibbs inside her residence.

When the officers entered the residence they were immediately inside the living room area of the house and could see through to the kitchen area of the house. Once the officers were inside, Wagner asked O'Kelley whether anyone else was in the house and she replied that it was just her and her child. O'Kelley then asked what this was regarding and Wagner told O'Kelley that they were looking for a subject named Kevin Taylor. (Tr. at 13.) As Wagner was explaining why the officers were there, Taylor exited a back bedroom and entered the kitchen area. (Tr. at 13-14.) Wagner then told Taylor that he was under arrest and proceeded to arrest Taylor in the kitchen area and place him in handcuffs. Wagner then asked Taylor whether there was anyone else in the residence and Taylor replied that there was a child in the bedroom. Wagner then went to the bedroom to make sure there was no one else in the bedroom and observed a small child lying on the bed. Wagner also observed a little bit of marijuana on a night stand next to the bed. (Tr. at 15.) At some point, Wagner radioed to Lopez and the uniformed officer and told them that Taylor was in the residence. Lopez and the uniformed officer then entered the residence. (Tr. at 15.)

Thereafter, Wagner spoke with Taylor and explained that there was a federal warrant for his arrest. Wagner also told Taylor that because he saw the marijuana in the bedroom the officers would

4

either need to apply for a search warrant or obtain his consent to search the residence. Taylor told Wagner that he could not provide consent to search the residence because it was his girlfriend's residence. (Tr. at 16.)

Wagner then spoke with O'Kelley in the living room of the residence. Officer Lopez was also in the living room area at that time. O'Kelley was upset and was trying to figure out why the police were there. Wagner explained that the police had received information that Taylor might be at her residence and that they had a warrant for Taylor's arrest. Wagner then explained that he had observed a little bit of marijuana in the bedroom and asked O'Kelley for her consent to search the residence. (Tr. at 18.) At that time, O'Kelley refused to consent to a search. Wagner then explained to her that because he saw the small amount of marijuana, he would have to apply for a search warrant and "freeze the scene," meaning that the police officers would have to sit there until they obtained a warrant. (Tr. at 18.) Wagner did tell O'Kelley that she had the right to refuse to consent, but if she did not consent, the police would still have to go through and apply for a warrant and the police would sit there until the judge made the decision on the application for the warrant. (Tr. at 19.) Wagner then again asked O'Kelley for consent to search the residence and O'Kelley gave consent. (Tr. at 20.) O'Kelley also provided written consent for the search. (Tr. at 21, Ex. 1.) After O'Kelley signed the consent form prepared by Wagner, the search of the residence began.

On cross-examination Wagner testified that one of the officers who was at 3118 N. 21st St. on February 16, 2006 could have been a female officer. (Tr. at 26.) Wagner also testified that when O'Kelley first opened the door, she only opened the door a crack. After the officers showed O'Kelley their identification badges through the crack in the door, O'Kelley opened the door fully and allowed the officers inside. (Tr. at 28.) O'Kelley was hesitant after the officers entered the

residence.  (Tr. at 31.)  Wagner further testified that, when he asked O'Kelley for her consent, she was not loud or boisterous, but she was concerned as to why the police needed to search the residence.  (Tr. at 36.)  Wagner explained to O'Kelley that applying for a search warrant was a long process and they would have to be there for several hours.  (Tr. at 37.) O'Kelley did not write anything herself saying that she gave the police consent.  Rather, Wagner wrote the consent form and O'Kelley signed it.  Wagner also testified that when he saw Taylor, he drew his weapon.  (Tr. at 44.) On redirect, Wagner testified that after the officers entered the residence it was less than a minute before Taylor appeared in the kitchen.  (Tr. at 50.)

**B. Gecoila O'Kelley**

Gecoila O'Kelley ("O'Kelley") testified that she is a 23 year old resident of the City of Milwaukee.  O'Kelley is currently employed as a certified nursing assistant ("CNA") and has been working as a CNA for the last six years.  On February 16, 2006, O'Kelley was awakened by the sound of someone trying to kick her door in.  (Tr. at 60.)  When she heard the noise at her door, O'Kelley grabbed her gun and went to the door.  After seeing through the window that it was the police, O'Kelley hid the gun and asked the police why they were there.  (Tr. at 61.)  The police told O'Kelley that they needed to speak to her about something that was going on in the neighborhood. O'Kelley then cracked the door slightly and the police pushed their way through.  After the police pushed their way through, they immediately went through her house.  (Tr. at 62.) O'Kelley testified that, although she only saw two officers at the door when she initially looked outside, four officers entered her house.  While O'Kelley was in her living room, the officers immediately went through her house, grabbed Taylor, and starting searching her house.  (Tr. at 62.)

When O'Kelley opened her front door slightly, no one asked her for permission to enter her apartment. (Tr. at 63.) At the time the officers asked her if they could search the house, they had already begun searching. The officers told O'Kelley that they had already found marijuana in the bedroom and because they had found the marijuana, they had "reasonable cause" to search. (Tr. at 64.) O'Kelley told the officers that she could not consent to the search because it was her mother's house. (Tr. at 64.) The officers responded that if O'Kelley gave them permission to search, they would search the house without tearing it up, but if they had to get a search warrant, they would completely tear the house up. (Tr. at 64.) O'Kelley again told the officers that she could not give them permission to search the house, but the officers proceeded to search anyway. (Tr. at 64.) O'Kelley further testified that the police entered her residence at 7:00 a.m. and that the officers had Taylor in handcuffs at 7:04 a.m. (Tr. at 65.) She is so specific about the times because when she woke up that morning the first thing she did was look at the clock.

O'Kelley testified that she never changed her answer about giving consent to search her residence. (Tr. at 66.) Nor did O'Kelley sign the written consent form, that is, Exhibit 1. (Tr. at 67.) That is not her signature on the consent form written by Detective Wagner. (Tr. at 67.) O'Kelley did however sign a sheet of paper stating that everything in the house was hers. (Tr. at 68.) O'Kelley did not open the door fully when she saw that it was the police because she had an outstanding traffic warrant. (Tr. at 70.) She did at some point also ask the officers to leave. (Tr. at 71.) O'Kelley also testified that the marijuana was not on top of the night stand in the bedroom, but rather, it was inside of the night stand cabinet under some papers. (Tr. at 72.)

On cross-examination, O'Kelley testified that the crack cocaine found in her home was not hers. (Tr. at 74.) But, she testified that the scales, the two one-half bags of marijuana, the ounce bag

7

of marijuana, and the loaded Tec-9 handgun were hers. (Tr. at 74.) When the police officers plowed their way through, the officers knocked O'Kelley over. (Tr. at 75.) O'Kelley also testified that if walking at a regular pace, it would take less than a minute to walk from her front door to the master bedroom in her house. (Tr. at 77-78.) Additionally, O'Kelley and Taylor are friends, but they also have a romantic relationship. (Tr. at 79.) O'Kelley and Taylor have been in a relationship, on and off, for the last two years. O'Kelley also testified that she does use marijuana. (Tr. at 81.) With respect to the crack cocaine found, O'Kelley testified that her friend, who she only knows as "CJ," left his coat at her house the night before, and the crack cocaine that was found fell out of his coat. (Tr. at 81.)

## C. Officer Mitchell Ward

Mitchell Ward ("Ward") testified that he is a City of Milwaukee police officer and has been a police officer for approximately fifteen years. (Tr. at 88.) Ward is currently assigned to the Milwaukee HIDTA drug and gang task force. Ward explained the typical process of obtaining a search warrant as follows. Ward meets with the informant before a controlled buy and searches the informant and the informant's vehicle. Ward then provides the informant with a recording device and money. The informant performs the controlled buy from the target, and after the transaction has taken place, Ward meets with the informant, obtains the controlled substance and any money that was not used, and debriefs the informant regarding the transaction. (Tr. at 90.)

Thereafter, Ward drafts an affidavit based upon the information obtained during the controlled buy. Ward uses a form affidavit where he only has to change a paragraph or two as to the specifics of location, time, etc. Ward also drafts the face sheet for the search warrant and then takes the affidavit and face sheet for the search warrant to the assistant district attorney. The assistant

8

district attorney then reviews the affidavit, has Ward sign the affidavit, and the assistant district attorney notarizes the affidavit. Ward then takes the signed and notarized affidavit as well as the face sheet to the preliminary hearing judge. (Tr. at 91.) The preliminary hearing judge then reviews the documents, ask any questions if he or she has any, and then the judge signs the search warrant. (Tr. at 92.) No copy of the search warrant is left with the judge. (Tr. at 93.) After the warrant is executed, Ward typically makes the return of the warrant by filling out a piece of paper describing the evidence recovered and signing and dating the warrant as to when it was served. (Tr. at 93.) Ward then either returns the warrant to the clerk of court's office himself or gives the warrant and the return to a liaison officer to return the warrant for him. (Tr. at 93.) Ward testified that he always keeps a copy of the warrant and return, however, in this case he can not find any copies of the warrant. (Tr. at 95.)

On September 22, 2005, Ward and FBI Special Agent Border Crow worked with an informant to make a controlled buy of crack cocaine from Taylor. (Tr. at 97, Ex. 4.) The transaction occurred at 2024 W. Nash St, a duplex. The informant told Ward that the transaction occurred in a common hallway of the duplex. However, Taylor had come down the stairs from the upper to complete the transaction, and returned up the stairs after the transaction was completed. (Tr. at 98.) On September 24, 2005, Ward prepared, applied for, and obtained a search warrant for the upper residence at 2024 West Nash St. (Tr. at 99-100.) In doing so, Ward followed the aforementioned process. Because Ward was unable to find a copy of the signed warrant and signed and notarized affidavit, Ward printed off an unsigned copy of the affidavit that was saved on his computer. (Tr. at 100.) Paragraph Ten of the unsigned copy of the affidavit provides the description of the place to be searched as follows:

9

> **The upper residence of 2024 W. Nash St.**, a 2-family duplex that has green color exterior, a greenish-grey roof, black iron bars covering the lower story windows facing West Nash Street Street [sic] and "2024" in white numerals mounted on the small attached porch facing West Nash Street this premises is located in the City/Village of Milwaukee, County of Milwaukee, State of Wisconsin;

(Tr. at 101, Ex. 2.) Ward is absolutely sure that this description was the description on the search warrant. (Tr. at 102.) After Ward prepared the affidavit and face sheet of the warrant, he had the affidavit notarized by an assistant district attorney. Ward then took the signed and notarized affidavit and face sheet to the preliminary hearing court judge and had the warrant signed by the judge. (Tr. at 103.)

The warrant was executed on September 27, 2005. Three microwaves with cocaine residue in them, a small amount of crack cocaine, and surveillance cameras were recovered from the upper residence of 2024 W. Nash St. (Tr. at 106.) Ward left a copy of the warrant at 2024 West Nash with the resident of the lower, Deborah Calhoun. Deborah Calhoun told Ward that she knew Taylor and that she would give him the copy of the warrant. Detective Dan Thompson, one of the detectives who searched the upper of 2024 W. Nash, wrote the report of the search. Detective Thompson's report begins as follows, "On Saturday, September 24th, 2005, at approximately 11:46 a.m., the Honorable David M. Sweet, Circuit Court Commissioner of the First Judicial District of Wisconsin, signed a search warrant commanding Officer Mitchell Ward to search the premises of 2024 West Nash Street . . . for cocaine and items associated with delivery and sale of cocaine." (Tr. at 107, Ex. 3.) Ward prepared the inventory for the search warrant and he gave the inventory to a liaison officer to return to the clerk of court.

Ward was asked numerous times to try to find the original or a copy of this warrant. Ward contacted all of the agents that had any contact with the warrant, he searched his own files, he

contacted the clerk of court's office, however, he has not been able to find either the original or a copy of the warrant. (Tr. at 109.) Ward did not save a copy of the face sheet of the warrant on his computer. (Tr. at 109.) On February 16, 2006, Ward and Crow interviewed Taylor and during that interview, Taylor acknowledged that he had either seen a copy of the warrant or had the copy of the warrant that was left with Ms. Deborah Calhoun on September 27, 2005.

On cross-examination, Ward testified that the report prepared by Detective Thompson does not provide a particularized description of the place to be searched or a detailed description of the items to be seized. (Tr. at 119.) Ward testified that he took the affidavit for the search warrant for 2024 W. Nash St. to Assistant District Attorney David Robles. However, Ward does not keep a diary or any other case log that would indicate when he went to ADA Robles to have this affidavit signed. (Tr. at 120.) In 2003, in an unrelated case, Ward testified at a suppression hearing with regard to Taylor. (Tr. at 122.) At that time, Ward testified that Taylor had consented to a search. However, the judge in that case found Ward's testimony incredible. Ward further testified that the clerk of court's office was not able to provide him with anything documenting the search warrant at issue in the instant case.

On redirect, Ward testified that he saw Court Commissioner Sweet sign the search warrant for the upper residence at 2024 W. Nash St. (Tr. at 124.) He also testified that the list of the items to be seized in paragraph seventeen of the unsigned affidavit was the same list of the items to be seized that was on the search warrant that was authorized by the court. (Tr. at 125.)


**D. FBI Special Agent Border Crow**


11

Border Crow ("Crow") testified that he has been a special agent of the FBI for the past ten years. (Tr. at 130.) On Thursday, September 22, 2005, Crow worked with an informant to perform a controlled buy from Taylor. Thereafter, on the following Saturday night, Crow received a call from Detective Ward, in which Ward told him that he had obtained a search warrant for Taylor's residence and that they would be executing the search warrant the next week. (Tr. at 132.) Crow saw a copy of the search warrant when he came into work on Sunday. Crow participated in the execution of the search warrant on September 27, 2005, and he left a copy of the search warrant with Deborah Calhoun. Ms. Calhoun told Crow that she would be able to provide a copy to Taylor. Crow further testified that when he interviewed Taylor on February 16, 2006, Taylor mentioned to Crow that he had seen Ward's name on the search warrant and knew that Ward was involved. (Tr. at 136.)

On cross-examination, Crow testified that he did not witness the notarizing or signing of the alleged affidavit, nor did he witness a judicial officer signing the search warrant. (Tr. at 136.)

## III. DISCUSSION

As previously stated, Taylor has filed two motions to suppress physical evidence. The first, is a motion to suppress all evidence seized from 3118 N. 21st Street on February 16, 2006. Taylor's second motion is a motion to suppress all evidence seized from the upper residence at 2024 East Nash Street on September 27, 2005. The court will address each motion in turn.

### A. Search of 3118 N. 21st Street

It is undisputed that at the time the police officers searched Gecoila O'Kelley's residence at 3118 N. 21st Street and seized the gun and drugs, they did not have a warrant authorizing them to do so. The government asserts that the authority to search the residence was based on the consent

12

of Gecoila O'Kelley. The defendant, in turn, argues that Gecoila O'Kelley did not consent to the search of her residence.

Warrantless searches are presumptively unreasonable under the Fourth Amendment. However, they are permissible when an individual voluntarily consents to the search. *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "The government must prove the consent was voluntary by a preponderance of the evidence." *United States v. Rice*, 995 F.2d 719, 724 (7th Cir. 1993). "[T]he question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth*, 412 U.S. at 227. In making this determination, a court is to consider several factors, including the following: age, education, and intelligence of the person consenting; advisement of her rights; how long she was detained prior to the consent; repeated requests for consent; physical coercion; and whether she was in custody. *See United States v. Bernitt,* 392 F.3d 873, 877 (7th Cir. 2004). Courts may also consider the location of where the consent was given. *United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994).

It is the government's burden to establish that O'Kelley consented to the search of her residence. In this regard, Detective Wagner testified that O'Kelley verbally consented to the search of her residence and also signed the written consent form prepared by Wagner. (Tr. at 20-21, Ex. 1.) To be sure, Detective Wagner testified that O'Kelley initially refused to consent to the search of her residence. However, Detective Wagner also testified that, after he explained to O'Kelley that if she refused to consent, which she had a right to do, the officers would have to apply for a search warrant

13

(a process that could take a few hours, meaning that the officers would be waiting for the warrant at her home for a few hours), O'Kelley changed her mind and consented to the search. (Tr. at 19-20.)

Not surprisingly, O'Kelley's version of the events that took place on the morning of February 16, 2006 is markedly different from the version presented by Detective Wagner. O'Kelley testified that when she cracked open her front door, all four police officers pushed their way through, knocking her over in the process, and immediately went through her home, evidently searching for Kevin Taylor. O'Kelley also testified that the police immediately began searching her home and told her that because they found marijuana in the bedroom they had "reasonable cause" to continue to search. O'Kelley also testified that although the officers asked her to consent to the search, she never gave the officers her consent, and she did not sign the written consent form. (Tr. at 66-67.) She further testified that at some point she asked the officers to leave.

In the end, the issue is whether Detective Wagner's version or Gecoila O'Kelley's version is more credible. As such, I start by noting that Detective Wagner's testimony was credible. There was nothing about the testimony of Detective Wagner which leads me to believe that he was lying in any fashion. Indeed, Detective Wagner's testimony on both direct and cross-examination was consistent. And, although Detective Wagner is an interested party in the sense that he has an interest in seeing a crime that he investigated successfully prosecuted and not bungled because of something he did wrong, he does not have a deep personal interest in the outcome of this particular case. Finally, Detective Wagner's testimony was that O'Kelley initially refused consent and it was only after he explained the search warrant application process and the "freezing" of the scene process to her that she consented. In my opinion, it seems highly unlikely that, if Detective Wagner did need to come up with a story to fabricate O'Kelley's consent, he would come up with the story that

14

O'Kelley first refused consent and then subsequently consented (thereby giving the defense a better argument that O'Kelley's subsequent consent was involuntary).

On the other hand, Gecoila O'Kelley's testimony was inconsistent and contained multiple implausibilities. For example, O'Kelley's testimony on direct examination established that, after observing two police officers at her front door, she cracked open the door and the police officers immediately pushed their way past her and into her home. On cross-examination, however, O'Kelley testified that when the officers pushed their way past her they also "knocked her down." Yet, if the police officers did in fact push their way through the front door with such force as to knock Ms. O'Kelley to the ground, it seems highly unlikely that Ms. O'Kelley would omit such an important and traumatic fact from her description of the events of February 16, 2006 that she testified to on direct.

Moreover, on direct, O'Kelley testified that the police officers entered her residence at 7:01 a.m. and had Taylor in police custody at 7:04 a.m. On cross-examination, however, O'Kelley testified that it would take a person walking at a normal gait less than a minute to walk from her front door to the master bedroom (from which Taylor allegedly emerged). (Tr. at 77-78.) O'Kelley's aforementioned testimony on cross-examination makes her testimony regarding the times at which the police entered her home and arrested Taylor appear implausible and, at the very least, inconsistent. This is because, according to her own testimony, it would have taken the officers, even assuming they were walking with a normal gait, less than a minute to find Taylor, not three minutes. Furthermore, Ms. O'Kelley has a personal interest in the outcome of this case. After all, O'Kelley and Taylor have been in an "on again/off again" romantic relationship for the past two years.

15

Finally, I am not persuaded that O'Kelley's testimony that the officers simply barged their way through her home without identifying themselves or drawing their weapons is credible. Simply put, that officers dressed in civilian garb would force themselves into a house suspected to be inhabited by a person charged with numerous serious drug and gun offenses, and for whom they have a federal arrest warrant, without their guns being drawn and without clearly identifying themselves as law enforcement officers is simply not believable. To the contrary, that is precisely the type of conduct that no reasonable police officer would engage in. It would be foolhardy to do so. Such officers would run the real risk of being misidentified as illegal intruders and thereby become victims of the alleged drug trafficker's taking steps to protect himself or his residence through violent means.

Simply put, I find Detective Wagner to be credible, and on the other hand, I find O'Kelley to be incredible. Such being the case, I am persuaded that Gecoila O'Kelley did consent to the search of her residence at 3118 N. 21st Street. Consequently, I now turn to the question of whether Ms. O'Kelley's consent was freely and voluntarily given.

It is the government's burden to establish that O'Kelley's consent was freely and voluntarily given. In this regard, and as previously noted, Detective Wagner testified that O'Kelley initially refused consent and it was only after he explained the search warrant application process and the "freezing" of the scene process to O'Kelley that she consented. Furthermore, Detective Wagner testified that, while Ms. O'Kelley was hesitant about having the police officers in her home and did ask questions regarding why they were there and why they needed to search her residence, at no point in time did Ms. O'Kelley or Detective Wagner raise his or her voice during their conversation. (Tr. at 20.) Nor did Detective Wagner display his firearm while attempting to obtain Ms. O'Kelley's consent; nor did he threaten her in any way to obtain her consent. (Tr. at 32.) Finally, Detective

16

Wagner testified that he advised Ms. O'Kelley of her right to refuse to consent. However, to reiterate, he did indicate that if she refused to consent the officers would have to apply for a search warrant, which could mean that the officers would occupy her residence for the next few hours. (Tr. at 19.)

In this case, the government has demonstrated by a preponderance of the evidence that O'Kelley voluntarily consented to the search of her residence. First of all, O'Kelley is not of tender age. She is twenty-three years old. Furthermore, although O'Kelley did not finish high school (and is therefore of somewhat limited formal education), she is not a woman unfamiliar with the world. Indeed, she is currently employed as a certified nursing assistant (CNA), and has been employed as such for the last six years. More importantly, she was articulate on the witness stand and testified that she understood everything the officers were telling her about consent and search warrants. (Tr. at 81.)

To be sure, O'Kelley might have felt intimidated by the presence of several police officers at her front door and in her home at such an early hour. However, there is no evidence that the police displayed firearms, threatened physical force, or badgered her repeatedly with requests for consent. And, when O'Kelley consented to the search of her residence, she was not under arrest or in any way detained. Indeed, O'Kelley did initially refuse to give consent, and it was only after Detective Wagner told her that if she did not consent they would apply for a search warrant, that she consented. Thus, to be precise, O'Kelley was asked "repeatedly" for her consent--she was asked twice. And, she was told that if she did not consent, the officers would apply for a search warrant. Yet, simply because O'Kelley was told that if she did not consent the officers would apply for a search warrant, it does not mean that her consent was not freely and voluntarily given. Given the observation of

17

marijuana, Detective Wagner's statement that if O'Kelley did not consent he would apply for a search warrant and freeze the scene until one was obtained, was not an empty threat or a pretext to gain O'Kelley's consent. *United States v. Sheets*, 188 F.3d 829, 840 (7th Cir. 1999). Moreover, given the tone of Detective Wagner and Ms. O'Kelley's conversation, and the fact that she was only asked twice by Detective Wagner for her consent, I am persuaded that the circumstances were not sufficiently coercive so as to vitiate her consent.

In sum, examining the totality of the circumstances surrounding O'Kelley's consent for the police to search her residence, I am persuaded that her consent was freely and voluntarily given. Accordingly, and for all the foregoing reasons, it will be recommended that the defendant's motion to suppress the evidence seized from 3118 N. 21st Street be denied.

**B. Search of 2024 East Nash Street**

It is undisputed that, on September 27, 2005, City of Milwaukee police officers searched the upper residence at 2024 East Nash Street and seized a small amount of crack cocaine, three microwaves with cocaine residue, and security cameras. The government asserts that the authority to search the residence was based on a valid search warrant, which has since its execution and return, gone missing. The defendant, in turn, argues that the government has not proven the existence of a search warrant for the upper residence at 2024 East Nash Street or the search warrant's exact language describing with particularity the place to be searched and the person or items to be seized.

It is the government's position that a search warrant for the upper residence at 2024 East Nash Street was signed by Court Commissioner Sweet on September 24, 2005, and thus, that the officers executed a valid search warrant when they searched and seized evidence from 2024 East Nash St. Since the search warrant's execution and return, however, the original search warrant (and its return)

18

and any copies that were made of the search warrant or the return have gone missing. Indeed, the original search warrant and the original return were not entered into evidence at the hearing on June 21, 2006. Neither were any copies of the search warrant, its supporting affidavit, or the return entered into evidence. What was entered into evidence at the hearing is the following: (1) a copy of the unsigned affidavit that Officer Ward prepared in this case to obtain a search warrant for 2024 East Nash St.; (Ex. 2); (2) a report written by Detective Thompson summarizing the search of 2024 East Nash on September 27, 2005, which includes a statement that the warrant was signed by Court Commissioner Sweet on September 24, 2005 (Ex. 3); and (3) a report written by FBI Special Agent Crow summarizing a controlled buy made by an informant from Kevin Taylor on September 22, 2005. (Ex. 4.)

Recently, the Eleventh Circuit Court of Appeals held that "when a warrant is not in evidence at a suppression hearing, a prosecutor must prove, by a preponderance of the evidence, the missing search warrant's *exact* language describing the place to be searched and the persons or items to be seized." *United States v. Pratt*, 438 F.3d 1264, 1270 (11th Cir. 2006) (emphasis in original). In *Pratt*, the defendant argued that the Fourth Amendment required the warrant itself to be produced at trial, and thus, because the government lost the search warrant in his case, all the evidence seized had to be suppressed. *Id.* at 1267. Pratt's motion to suppress, however, was denied. This is because the district court found that a search warrant with descriptive language mirroring the affidavit's language did exist and that the warrant met the Fourth Amendment's particularity requirement. *Id.* at 1268. The district court based its finding on the testimony presented at the suppression hearing, the affidavit, and the inventory.

19

At the suppression hearing in *Pratt*, the government introduced into evidence the signed affidavit which provided probable cause for the issuance of the search warrant as well as the warrant's inventory (presumably, the warrant's "return"). Furthermore, Judge Modesitt, the judge who issued the missing search warrant, and who also witnessed and signed the affidavit, testified that, because he follows the same procedure each time he issues a warrant, "he was absolutely sure that he had issued a search warrant with descriptive language identical to the affidavit's." *Id.* at 1268. The detective who prepared and signed the affidavit, Detective Wysocki, also testified at the suppression hearing. Detective Wysocki testified that he specifically recalled obtaining the search warrant from Judge Modesitt. He further testified that he read the warrant to Pratt before conducting the search and left a copy of the warrant on the kitchen counter before arresting Pratt. *Id.* at 1268. Another officer also testified that he was present when the search was conducted and heard Detective Wysocki read the warrant to Pratt and saw Detective Wysocki leave a copy of the warrant at Pratt's residence. A third officer testified that he went to the clerk's office to get a copy of the first page of the search warrant, only to find that it was missing.

The Eleventh Circuit agreed with Pratt that "the contents of the search warrant itself, not the contents of the supporting documents, are scrutinized under the Fourth Amendment's particularity requirement."*Id.* at 1269-70. However, the court would not accept Pratt's argument that "a missing warrant creates an irrebuttable presumption that no warrant ever existed or, alternatively, that the missing warrant's descriptive language lacked particularity." *Id.* at 1269. Rather, as previously stated, the court held that when the warrant is not in evidence, the government must prove the missing search warrant's *exact* language describing the place to be searched and the persons or items to be seized by a preponderance of the evidence. The Eleventh Circuit went on to state that:

The Government in some cases may not be able to prove a search warrant's existence or its exact descriptive language. In those cases, the search is treated as if it were warrantless and the evidence may be suppressed. But in cases like the present one, where ample evidence is produced, to prohibit the Government from presenting that evidence would be untenable. We hold that other evidence of a search warrant's existence and descriptive language may be used in a suppression hearing to prove that a search was conducted with a warrant that particularly described the place to be searched and the persons or items to be seized.

*Id.* at 1270 (footnote omitted).

Turning to the facts of this case, in my opinion, the government has not provided "ample evidence" to prove the missing search warrant's *exact* language describing the place to be searched and the persons or items to be seized. To be sure, based upon Officer Ward and Special Agent Crow's testimony, in conjunction with the report written by Detective Thompson summarizing the execution of the search warrant, I could find that a search warrant for the upper residence at 2024 E. Nash St. existed. Yet, whether the warrant simply *existed* is not the question before the court. Rather, the question is whether the government has provided sufficient evidence to prove by a preponderance of the evidence the search warrant's *exact* language. And, this is where the government has failed to meet its burden.

The *only* evidence the government presented to establish the *exact* language of the missing search warrant was Officer Ward's testimony that the language describing the place to be searched and the person or items to be seized used in paragraphs 10 and 17, respectively, of the affidavit (which affidavit was <u>not signed</u>, <u>not notarized</u>, and <u>not dated</u> (Ex. 2)) was the same language that was used to describe the place to be searched and the persons or items to be seized on the missing search warrant. In my opinion, this evidence, standing alone, is insufficient to prove the exact language that

21

was used to describe the place to be searched and the persons or items to be seized on the missing warrant.

To begin, Officer Ward's testimony was previously rejected by a state court judge. Although the state court judge rejected Officer Ward's testimony in a case that is unrelated to the case at bar, the issue before the state court judge in that case was whether the very same person who is the defendant in this case, Taylor, had consented to a search. And, in that case, the state court judge found Officer Ward's testimony that Taylor had consented to be incredible. While this court does <u>not</u> find that Officer Ward was an incredible witness, at the same time the court cannot ignore the fact that the person providing the *only* evidence for the government has, at least, a heightened interest in the case. That is, although every officer is interested in each case to some extent, in the sense that the officer has an interest in seeing a crime that he investigated successfully prosecuted and not bungled because of something he did wrong, here, Officer Ward may very well have a heightened interest because at least once before he has had a court suppress incriminating evidence that he recovered against Taylor.

The bottom line is that this is not a case where the government has presented "ample evidence" to prove the existence and exact language of the search warrant, as was the case in *Pratt*. To reiterate, in *Pratt*, the government presented an affidavit signed by the detective and witnessed by the judge, the warrant's inventory, the judge's testimony that he was absolutely sure that the exact language on the affidavit appeared on the search warrant, and officers' testimony that the warrant's language was read to the defendant. By contrast, in this case, the *only* evidence offered by the government on the issue of the *exact* language of the search warrant was Officer Ward's testimony. In my view, that is not "ample evidence." Simply stated, when contrasted with the evidence offered

22

by the government in *Pratt*, the paucity of evidence offered by the government in the case at bar leads me to conclude that it has not met its burden of proving by a preponderance of the evidence the missing search warrant's exact language describing the place to be searched and the persons or items to be seized. Such being the case, the search should be treated as warrantless, and the evidence suppressed. *Pratt*, 438 F.3d at 1270. Accordingly, and for all of the foregoing reasons, it will be recommended that the defendant's motion to suppress the evidence seized from the upper residence at 2024 East Nash Street be granted.

      **NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress "all items seized from 3118 N. 21st Street" be **DENIED**;

      **IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress "all items seized from 2024 East Nash Street" be **GRANTED**.

      Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

      **SO ORDERED** this <u>1st</u> day of August, 2006, at Milwaukee, Wisconsin.


                    <u>/s/ William E. Callahan, Jr.</u>
                    WILLIAM E. CALLAHAN, JR.
                    United States Magistrate Judge